Filed 2/18/21

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HILJA KEADING et al., <br><br>     Plaintiffs and Respondents, <br> v. <br> KENTON KEADING, <br><br>     Defendant and Appellant. | A151468, A153075 <br><br> (Contra Costa County <br> Super. Ct. No. MSP1600402) |
| KENTON KEADING, <br><br>     Plaintiff and Appellant, <br> v. <br> HILJA KEADING, <br><br>     Defendant and Respondent. | A152034 <br><br> (Contra Costa County <br> Super. Ct. No. MSC1602351) |

In these three consolidated appeals, Kenton Keading, appearing in propia persona, appeals from a judgment and orders in related actions arising from claims asserted by his sister, Hilja Keading, that he committed elder abuse against their deceased father.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A.1.a, A.2.b, A.2.c, B, and C of the Discussion.

1

The first two appeals stem from Hilja's elder abuse litigation against Kenton.[1]  In the first, Kenton appeals from the judgment which found him liable for elder financial abuse through undue influence and ordered him to pay approximately $1.5 million in damages.  In the second, Kenton appeals a prejudgment right to attach order which attached Kenton's interest in a property in partial satisfaction of the anticipated damages in the elder abuse litigation.  The third appeal arises from the libel complaint Kenton filed against Hilja for an email she wrote stating Kenton had committed elder abuse.  Kenton appeals the trial court's order granting Hilja's motion to strike the complaint as a strategic lawsuit against public participation (SLAPP) and dismissing the action.

In the published portion of this opinion, we hold that substantial evidence supports the trial court's finding of elder financial abuse (part A.1.b of Discussion, *post*) and conclude that Probate Code section 859 authorizes an award of double damages for the commission of elder financial abuse without a separate finding of bad faith (part A.2.a of Discussion, *post*) in his appeal of the elder abuse judgment.  In the unpublished portion of the opinion, we reject Kenton's other challenges to the elder abuse judgment and his appeals of the prejudgment attachment order and dismissal of his libel action.

### FACTUAL AND PROCEDURAL BACKGROUND

Many of the following facts are taken from the trial court's post trial statement of decision in the elder abuse action.

Lucille and Lewis Keading, wife and husband, died within a few months of each other in September 2015 and January 2016, respectively.  Decades before their deaths, they created a family trust for the benefit of

---

[1]     The two parties and their parents share the same last name.  For brevity sake, we will refer to all of them by their first names.  No disrespect is intended.

2

their two children, Kenton and Hilja, who were to split the trust assets equally after their parents' deaths.  The main trust asset was the family residence on 60, 50, and 21 Laurel Lane in El Sobrante (the Property).

During their lifetimes, Lucille and Lewis provided financial assistance to Kenton but not to Hilja.  This was in part to help Kenton after he was imprisoned for nine years following felony convictions.  Also, for many years, Hilja and her parents were estranged from each other as a result of the parents' inability to accept Hilja's sexual orientation.

In 2011, Lucille and Lewis amended the trust to give Hilja a specific gift (an investment account) and made Kenton the residual beneficiary of the remainder of the trust.  By fall 2014, the parents and Hilja had reconciled, and they began to see each other more.  Nonetheless, in February 2015, when the parents again amended the trust, they essentially restated the terms of the 2011 amendment that left Kenton all trust assets but for the investment account left to Hilja.  At the same time, Lewis granted a power of attorney to Kenton.

In June 2015, Lucille was diagnosed with a brain tumor.  Hilja, who lived in Southern California, returned to her parents' home in Northern California to spend time with and care for them, clean their house, and organize their finances and medical care.  Kenton was living overseas around this time but once Lucille fell ill, he also returned to Northern California and frequently visited his parents, sometimes staying overnight.  Lucille died on September 10, 2015.

Following Lucille's death, Lewis's health began to deteriorate.  He required semi-weekly kidney dialysis treatment and ongoing in-home care.  Hilja stayed on to help her father.  Kenton, too, helped and generally stayed overnight with his father for the night shift.  Connie Warner, a long-time

3

family friend, and Kim Terry, a home health care agency worker, also assisted with Lewis's care.

During this time, it appears that Lewis's attitude towards Hilja had changed. He executed a durable power of attorney designating Hilja his attorney-in-fact in late September 2015. Around the same time, he contacted his estate planning attorney Peter Sproul about undoing the earlier amendment and amending the trust to equalize the assets distributed to his children after his death. Sproul testified that he spoke with Lewis on the phone and met with him in person to discuss this change.

Lewis executed an " 'equalizing amendment' " to his trust in early October 2015. The amendment directed that trust assets be divided to result in a " 'net equalization' " between the siblings, meaning each one would receive the same net amount from the trust as a whole. To account for assets previously distributed, the amendment specifically noted that Lucille and Lewis had previously lent Kenton $75,000. Sproul testified that after he explained the details to Lewis, Lewis signed the amendment in front of him. Sproul further explained that he typically makes efforts to determine if a client has capacity or is subject to undue influence. Sproul "saw no indication Lewis lacked capacity or was under influence," and he perceived that Lewis "understood, was very sharp" and "knew exactly what he was doing."

On December 8, 2015, Hilja returned to Southern California for a week. While she was away, Kenton discovered an email she sent to an attorney friend stating she was looking for a lawyer to pursue Kenton for claimed elder abuse. In the email, she wrote, "I need the best bad-ass, take-no-prisoner Probate Attorney that I can find who is willing to litigate if necessary, and will not put up with the antics of my brother, a homophobic felon who has manipulated and engaged in every literal category of elder

4

abuse with his parents. . . . I need someone to represent me on every level so I do not have to interact with my brother in any way. He is dangerous to me." Kenton promptly shared the email with Lewis, who was upset by it. According to Kenton, upon reading the email, Lewis stated, " 'I have misjudged your sister' " and " 'I have made a big mistake,' " and he wished to change the disposition of his estate.

On December 12, 2015, while Hilja was still away, Kenton took Lewis to a UPS store, where Lewis executed a new power of attorney designating Kenton as attorney-in-fact, which was notarized. When Hilja returned to Northern California days later, she and her father discussed the email Kenton had discovered. According to Hilja, Lewis told her " 'it didn't change anything.' " Even so, Lewis executed a typed declaration on December 19, 2015, stating he was not the victim of elder abuse. In the declaration, Lewis asserted, "My son, Kenton Keading, has not committed any acts of abuse, either physical or mental to myself . . . . On the contrary, Kenton has always been actively supporting and caring of myself and his mother." The document set forth the statutory definition of "elder abuse" under the Penal Code, after which Lewis continued: "It is my firm belief that my son, Kenton Keading, never willfully or otherwise, committed any acts or omissions that constitute 'elder abuse' as defined above." At trial, Kenton explained that Lewis signed the document after Kenton shared his fear that Hilja would fabricate criminal elder abuse charges against him that could send him back to jail. He said the general content of the letter was Lewis's idea, but Kenton had included the statutory reference.

Lewis's execution of the declaration was witnessed by home health care worker Terry and neighbor Scott Maskell, who both signed the document as witnesses and testified at trial. Terry stated there was a blank cover sheet

5

over the document when she signed it. She also recalled that Lewis said he wrote the document, though she had seen Kenton typing the document on the computer and making various changes to it before presenting the document to Lewis without explaining what it was. She further added that Lewis was declining at the time. Maskell similarly stated that the document he saw Lewis sign was covered, so Lewis could not see what he was signing. According to Maskell, Lewis said he wrote the document and confirmed that it concerned his estate and that his estate was in order. It was Maskell's impression that Lewis seemed to know what he was doing.

Around Christmas, Lewis made the decision to discontinue dialysis.

On December 30, 2015, acting under the recently conferred power of attorney, Kenton executed a grant deed transferring the Property out of the trust and to himself and Lewis in joint tenancy with right of survivorship. He did not show Hilja the deed before Lewis's death.

Several witnesses described further deterioration to Lewis's health in the final days of 2015 once he had stopped dialysis. Terry stated she worked on New Year's Eve, and Lewis was very sick that day and could not eat. The next day, New Year's Day, he got out of bed and ate but did not get up much after that.

It was also on New Year's Day, or January 1, 2016, that Lewis transferred to Kenton nearly 99,678 shares of stock in Freedom Motors, which had been purchased years earlier for $1 per share. Lewis's signature on the transfer document is barely legible. Warner, the family friend helping with Lewis's care, was present when Lewis executed the transfer. At trial, she testified that Lewis was very sick, could not raise his head, and barely had strength to physically sign. Kenton admitted he did not show Hilja the stock transfer before Lewis died.

On January 2, 2016, acting again under the power of attorney, Kenton executed another trust amendment that removed Hilja as successor trustee.

Lewis died on January 4, 2016. Four days later, Kenton recorded the grant deed which had transferred the Property from the trust to him and his father as joint tenants.

After Hilja left the Property on January 9, 2016, Kenton held possession of the Property. In late February 2016, he rented out the house while he went abroad. He also sold Lewis's car for $8,500, which he kept.

On March 16, 2016, after discovering that Kenton had represented himself as their father's attorney-in-fact and had executed a grant deed transferring the Property from the family trust to himself, Hilja petitioned the trial court ex parte to suspend and remove Kenton as trustee of the family trust, appoint a successor trustee, and confirm trust ownership of the Property. Through this petition, which functioned as the operative pleading in the litigation, Hilja sought to set aside the December 30, 2015 grant deed, recover any assets Kenton attempted to transfer from the trust to himself, and hold Kenton liable for damages resulting from elder abuse, fraud, conversion, and intentional interference with an expected inheritance.

That same day, the trial court suspended Kenton as trustee. It appointed Elizabeth Soloway, a professional fiduciary, as the trustee. The court declared the grant deed invalid on its face and ordered Kenton to account for his actions as attorney-in-fact and as a trustee over the previous year. It set a further hearing on the petition.

In May 2016, Kenton, represented by counsel, filed an answer to Hilja's petition setting forth multiple objections, including one to the trial court's order invalidating the grant deed without due process. Following a hearing, the court vacated and set aside its March 2016 orders as void, other than the

appointment of Soloway as trustee, to which the parties had stipulated. With the pleadings settled, the parties engaged in months of discovery and motions.

In early 2017, Soloway joined as a plaintiff in Hilja's cause of action seeking to confirm trust ownership of the Property. Around this time, Kenton's counsel withdrew from the case.

In April 2017, while the litigation progressed, Hilja filed an application for a writ of attachment against Kenton's interest in a separate property located in Crockett. In the application she averred that Kenton had few ascertainable assets, which made her concerned that he was going to wrongfully transfer or encumber his interest before her claims against him reached judgment. Following a hearing, and over Kenton's objection, the trial court granted the application, Kenton appealed the court's attachment order in Case No. A151468.

Months later and by stipulation of the parties, the trial court resolved the discrete issue of whether the December 30, 2015 grant deed transferring the Property from the trust to Kenton and Lewis as joint tenants was valid. The court found the transfer invalid, set aside the grant deed, and vested title to the Property with the trustee as an asset of the trust. The court cited multiple reasons for its decision, including Kenton's concession that the grant deed was invalid. Independent of this concession, the court reached its own conclusion the grant deed was invalid because Kenton had no authority to execute it. The court explained the December 2015 durable power of attorney purportedly restoring Kenton as attorney-in-fact did not satisfy the statute of frauds since Lewis signed the durable power of attorney individually and not as a trustee, though the Property was held in the trust. The court further observed that the trust terms did not authorize Lewis to delegate the

8

authority to convey real property from the trust. Noting its decision did not adjudicate all of Hilja's claims, the court deferred the unresolved issues for trial, including the issue of whether Kenton's execution of the grant deed constituted elder financial abuse.

Prior to that trial, an entirely separate proceeding initiated by Kenton against Hilja reached resolution in the trial court. Kenton, appearing in propia persona, had sued Hilja for libel based on her email stating he had committed elder abuse of his parents and was homophobic. Hilja moved to strike the complaint as a meritless SLAPP suit. Following a hearing, the trial court granted Hilja's anti-SLAPP motion and denied Kenton's request to conduct discovery. Kenton appealed the court's dismissal of his complaint in Case No. A152034.

In late June and early July 2017, there was a four-day bench trial on the remaining issues in Hilja's elder abuse action against Kenton, who by then obtained counsel to represent him. The trial court heard testimony from various witnesses and admitted dozens of documents into evidence.

The trial court issued a statement of decision, in which it concluded Kenton was liable for elder abuse. While finding that Kenton "did not have substantial authority over Lewis" and did not isolate Lewis or make Lewis solely dependent on him, the court nonetheless found that Kenton exerted "substantial undue influence over Lewis." Thus, the court determined that the power of attorney, the grant deed transferring the Property out of the trust, and the stock transfer—all done in the month before Lewis died—all resulted from elder abuse. In the court's view, "[t]he last clear, lucid, considered disposition of the trust was to equalize the distribution between Hilja and Kenton."

9

The trial court's amended judgment, entered on September 19, 2017 ordered Kenton to pay damages in the amount of $1,548,830.  The court directed that Kenton "immediately vacate" the Property and declared that Soloway, as successor trustee, was entitled to its immediate possession.  The court also ordered Kenton to immediately provide the original Freedom Motors stock certificates to Soloway.  After the judgment, Kenton resumed representing himself in propia persona and filed an unsuccessful motion for a new trial.

Kenton appealed the foregoing judgment in Case No. A153075.  In his notice designating the record on appeal, Kenton elected to proceed with a settled statement as a record of oral proceedings in the trial court.  The parties stipulated that they would attempt such a statement but were unsuccessful.  The court prepared it instead.

After the appeals in Case Nos. A151468, 152034, and 153075 were fully briefed, we consolidated them for purposes of oral argument and decision and further granted them calendar preference.

## DISCUSSION

### A.    Case No. A153075

#### 1.  *Elder Abuse Act*

The purpose of the Elder Abuse Act (Welf. & Inst. Code, § 15600 et seq.) is " 'essentially to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect.' " (*Estate of Lowrie* (2004) 118 Cal.App.4th 220, 226 (*Lowrie*).)  Although the Elder Abuse Act was originally enacted to encourage the reporting of abuse of elders and dependent adults, the Legislature modified the statutory scheme to "provide incentives for private, civil enforcement through lawsuits against elder abuse and neglect." (*Ibid.*)

10

a.  Standing

As a threshold matter, Kenton argues Hilja lacked standing to assert her claims for elder abuse.  He contends that Hilja could not sue him for taking trust property because such claims could only be asserted by the trustee, Soloway.  The trial court rejected Kenton's argument, and so do we.

" 'Standing' is a party's right to make a legal claim and is a threshold issue to be resolved before reaching the merits of an action." (*Said v. Jegan* (2007) 146 Cal.App.4th 1375, 1382.)  Generally, standing is a question of law to which we apply a de novo standard of review.  (*San Luis Rey Racing, Inc. v. California Horse Racing Bd.* (2017) 15 Cal.App.5th 67, 73.)

"Standing, for purposes of the Elder Abuse Act, must be analyzed in a manner that induces interested persons to report elder abuse and to file lawsuits against elder abuse and neglect." (*Lowrie, supra*, 118 Cal.App.4th at p. 230.)  When the Legislature enacted Welfare and Institutions Code section 15657.3,[2] it "specified that the Elder Abuse Act was intended to 'enable *interested persons* to engage attorneys to take up the cause of abused elderly persons and dependent adults.' [Citation.]  This statement of legislative intent suggests the Legislature intended a broad definition of standing in the context of elder abuse cases." (*Lowrie*, at p. 227.)

The operative statutory provision governing standing in a case alleging elder abuse is section 15657.3, subdivision (d).  (*Lowrie, supra*, 118 Cal.App.4th at p. 227.)  Following the death of an elder, and subject to certain exceptions not applicable here, "the right to commence or maintain an action shall pass to the personal representative of the decedent."  (§ 15657.3, subd. (d)(1).)  A personal representative includes a person who is a trustee of

---

[2]    All unlabeled statutory references are to the Welfare and Institutions Code unless otherwise stated.

an estate. (*Tepper v. Wilkins* (2017) 10 Cal.App.5th 1198, 1204–1205; see § 15610.30, subd. (d).)

Here, Kenton recognizes that when Hilja initiated the action, she was a co-trustee of the family trust, a status that readily conferred her standing to commence the action against him for elder abuse. (§ 15657.3, subd. (d)(1).) Kenton argues, however, that Hilja lost her standing to maintain the action when she voluntarily suspended herself as trustee and the court appointed Soloway the acting trustee in the litigation. We are not persuaded.

Even if we assume, as Kenton argues, that Soloway became the representative of Lewis's estate upon accepting her appointment as trustee, Kenton acknowledges that Soloway declined to join as a plaintiff in prosecuting the elder abuse claim. Pursuant to section 15657.3, subdivision (d)(1)(c) and (d)(2), when a representative refuses to maintain an action, the right to prosecute may pass to any "interested person" within the meaning of Probate Code section 48, such as a "beneficiary" or "any other person having a property right in or claim against the trust estate."[3] Neither party disputes that Hilja is a trust beneficiary. Consequently, she qualifies as an "interested person" under Probate Code section 48. Her beneficiary status also qualifies her as "any other person having a property right in or claim against the trust estate." (Prob. Code, § 48.) Accordingly, we reject Kenton's standing challenge.

---

[3]     An "interested person" is defined as "[a]n heir, devisee, child, spouse, creditor, beneficiary, and any other person having a property right in or claim against a trust estate . . . which may be affected by the proceeding." (Prob. Code, § 48; *Estate of Sobol* (2014) 225 Cal.App.4th 771, 782–783 [to be an interested person under Probate Code section 48, a child, spouse or beneficiary must also have a "property right in or claim against a trust estate"].)

12

Kenton's reliance on *Saks v. Damon Raike & Co.* (1992) 7 Cal.App.4th 419 is misplaced. *Saks* has no bearing here, as it did not involve or address a beneficiary's standing to sue for elder abuse under section 15657.3, subdivision (d). (See *Saks*, at pp. 426–430.)

b. <u>Substantial Evidence</u>

Kenton argues substantial evidence does not support the trial court's finding of elder financial abuse. We disagree.

"In reviewing a judgment based upon a statement of decision following a bench trial, . . . [w]e apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

Pursuant to section 15610.30 of the Elder Abuse Act, financial abuse of an elder occurs when a person "[t]akes, secretes, appropriates, obtains, or retains . . . real or personal property of an elder or dependent adult by undue influence, as defined in Section 15610.70." (§ 15610.30, subd. (a)(3).) Section 15610.70 defines "undue influence" as "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." (§ 15610.70, subd. (a).) In determining whether a result was produced by undue influence, section 15610.70 directs courts to consider: (1) the victim's vulnerability; (2) the influencer's apparent authority; (3) the tactics used by the influencer; and (4) the inequity of the result. (§ 15610.70, subd. (a)(1)–(4); see also *Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 867.) Because perpetrators of undue influence rarely leave any direct evidence of their actions, plaintiffs typically

13

rely on circumstantial evidence and the reasonable inferences drawn from that evidence to prove their case. (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 601 [because direct evidence of undue influence is rarely obtainable, "[t]he court is often obliged to infer undue influence from the totality of the circumstances" (italics omitted)].)

Here, there was substantial evidence supporting the trial court's finding of elder financial abuse. First of all, the record amply establishes that Kenton took, obtained, or retained both real and personal property belonging to Lewis. Kenton executed the grant deed to remove the Property as a trust asset to be shared with Hilja, essentially attempting to deed the Property to himself. Kenton also obtained stock certificates belonging to Lewis and exercised rights over Lewis's car when he sold it.

The record also evidenced each of the four considerations for undue influence under section 15610.70. The first factor, the victim's vulnerability, may be demonstrated by "incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability." (§ 15610.70, subd. (a)(1).) Here, there was abundant evidence that Lewis was vulnerable around December 2015 when Kenton executed most of the improper transactions. In the last weeks of his life, Lewis was grieving the loss of Lucille and his health had deteriorated such that he needed round-the-clock care. He required kidney dialysis, which he ultimately decided to discontinue. As one of Lewis's care providers, Kenton was well aware of his father's many vulnerabilities in the last month of his life.

The second factor, the "influencer's apparent authority," may be demonstrated by the influencer's "status as a fiduciary, family member, care

14

provider, health care professional, legal professional, spiritual adviser, expert, or other qualification." (§ 15610.70, subd. (a)(2).) This criterion was readily satisfied, since Kenton was Lewis's only son and one of his care providers.

The third factor, the influencer's actions or tactics, may be demonstrated by the influencer's "[i]nitiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, [and] effecting those changes at inappropriate times and places." (§ 15610.70, subd. (a)(3)(C).) Here, the record discloses that, in the week Hilja was away, Kenton rushed his father to a UPS Store to execute a new power of attorney designating him attorney-in-fact. As Lewis's attorney-in-fact, Kenton then executed the grant deed that transferred the Property out of the trust. Kenton mentioned nothing about these matters to his sister.

The fourth factor, the inequity of the result, may be demonstrated by "the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship." (§ 15610.70, subd. (a)(4).) Here, there was substantial evidence that the effects of Kenton's activities on Hilja, a trust beneficiary, were significant. Kenton's actions removed the main asset from the trust, resulting in a significant economic loss for Hilja as a trust beneficiary. As the trial court found, such result was counter to Lewis's last clear, lucid, and considered disposition of the trust to equalize distribution between Hilja and Kenton. In sum, there was substantial evidence of elder financial abuse by undue influence.

15

Kenton argues there was no substantial evidence of any real property taking because he conceded the grant deed was invalid. We cannot agree. In December 2015, Kenton executed the grant deed, then recorded it to give it legal effect. He used the grant deed as a basis to maintain possession of the Property, lease it, and regulate access provided to Soloway in her capacity as acting trustee. Kenton's concession occurred after months of litigating and defending against Hilja's lawsuit challenging the validity of the grant deed. For 18 months, until the court invalidated the grant deed, there was indeed an actionable taking of real property in violation of the Elder Abuse Act.

*Estate of Sarabia* (1990) 221 Cal.App.3d 599 (*Sarabia*), superseded by statute on other grounds as stated in *Rice v. Clark* (2002) 28 Cal.4th 89, does not assist Kenton's case. In *Sarabia,* the court held: "The presumption of undue influence arises only if *all* of the following elements are shown: (1) the existence of a confidential relationship between the testator and the person alleged to have exerted undue influence; (2) active participation by such person in the actual preparation or execution of the will, such conduct not being of a merely incidental nature; and (3) undue profit accruing to that person by virtue of the will. If this presumption is activated, it shifts to the proponent of the will the burden of producing proof by a preponderance of evidence that the will was not procured by undue influence." (*Id.* at p. 605.) According to Kenton, there was no undue influence here because evidence of the second and third *Sarabia* elements were missing. We are not convinced.

*Sarabia* describes the common law test for undue influence, and as indicated by the holding quoted above, addresses when a *presumption* of undue influence arises. Here, the trial court did not rely on any presumption and instead made a direct finding of undue influence under the statutory standard based on all relevant facts and circumstances. Nevertheless, even

16

under the common law test, substantial evidence supports a presumption of undue influence. As already discussed, Kenton was an active participant in Lewis's execution of the power of attorney that made him attorney-in-fact, and he prepared and executed the grant deed that would transfer the Property out of the trust. By virtue of the grant deed, stock transfers, and car sale, Kenton accrued undue profit when those assets were removed from the trust in contravention of Lewis's intent for net equalization between Kenton and Hilja.

Finally, Kenton argues the evidence was insufficient to support the finding that he acquired stock certificates and Lewis's vehicle through elder financial abuse. Not so. The stock transfer occurred days before Lewis's death, when he was very sick and barely capable of signing. And though the car was sold after Lewis died, Kenton came to control the Property and its contents, including the car, by virtue of the grant deed he executed under the dubious power of attorney which he rushed Lewis to execute.

### 2. *Probate Code Section 859*

Kenton raises several challenges to the imposition of liability under Probate Code section 859.

#### a. Bad Faith

Kenton first argues the court erroneously construed Probate Code section 859 by imposing double damages for his commission of elder financial abuse without a finding of bad faith.

Since this is an issue of statutory construction, we follow "the oft-repeated rule that when interpreting a statute we must discover the intent of the Legislature to give effect to its purpose, being careful to give the statute's words their plain, commonsense meaning. [Citation.] If the language of the statute is not ambiguous, the plain meaning controls." (*Kavanaugh v. West*

17

*Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 (*Kavanaugh*).)

Probate Code section 859 provides: "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a conservatee, a minor, an elder, a dependent adult, a trust, or the estate of a decedent, or has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the person shall be liable for twice the value of the property recovered by an action under this part."

The language of Probate Code section 859 is not ambiguous in specifying when a bad faith finding is necessary for double damages. The statutory language contains three different clauses describing the three different categories of conduct that can support double damages, each of which is separated by the conjunction "or." The first two categories require a separate finding of bad faith but the third one—applying when a person "has taken, concealed, or disposed of the property . . . through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code"—does not.

Three courts of appeal have addressed this issue. Our reading comports with two of them. In *Hill v. Superior Court* (2016) 244 Cal.App.4th 1281, the court noted that "the last alternative of section 859 allows for double damages without any requirement that petitioners show any aggravated misconduct—only financial elder abuse." (*Id.* at p. 1287.) In *Kerley v. Weber* (2018) 27 Cal.App.5th 1187, the court reviewed the statutory language and concluded no separate bad faith finding was necessary for double damages when liability was premised on the third category of conduct,

18

that is, when property had been taken through elder or dependent adult financial abuse. (*Id.* at pp. 1197–1198.)

*Levin v. Winston-Levin* (2019) 39 Cal.App.5th 1025 (*Levin*) concluded otherwise, stating, "We do not believe the Legislature intended to provide double damages for undue influence *without* bad faith." (*Id.* at p. 1036.) We respectfully disagree with *Levin*'s reasoning. First, *Levin* based its conclusion on the language "by the use of undue influence in *bad faith*." (*Ibid.*) But this "bad faith" language appears in the clause pertaining to the second category of conduct, not in the clause relating to the third category at issue here. (Prob. Code, § 859.) Second, *Levin* found no indication in the legislative history of an intent to create two different standards for penalizing undue influence. (*Levin*, at p. 1036.) This reasoning, however, belies a plain reading of the statute, which serves as the foremost determinant of legislative intent.

*Levin* also reasoned that if courts could impose double damages in elder financial abuse cases without a finding of bad faith, the second category of conduct—"undue influence in bad faith"—would be rarely used and only applicable in the few cases involving minors. (*Levin*, *supra*, 39 Cal.App.5th at p. 1036.) But the second category of conduct also refers to the taking of property belonging to a "trust" or the "estate of a decedent," regardless of whether the victim is or was an elder or dependent adult. Thus, the second category covers a broad array of cases, not just those involving minors or elders, in which a defendant who takes property through undue influence is not necessarily committing elder financial abuse. In sum, we are not persuaded by *Levin*'s reasoning to ignore the plain meaning of the statutory text, which expressly makes "the use of undue influence in bad faith" and

19

"the commission of elder or dependent adult financial abuse" separate and distinct categories triggering double damages. (Prob. Code, § 859.)

Kenton's other interpretation arguments do not compel a different result. He argues that Probate Code section 859's introductory phrase "[i]f a court finds that a person has in bad faith . . ." modifies all three categories of conduct in the statute. Not so. The "bad faith" reference plainly modifies only the first category of conduct, because otherwise the "bad faith" modifier in the second category would be rendered surplusage. (See *B.B. v. County of Los Angeles* (2020) 10 Cal.5th 1, 12–13.) He also contends the words "in bad faith" in the phrase "by the use of undue influence in bad faith" apply to the phrase "or through the commission of elder or dependent adult financial abuse" because both refer to the same property taken. Kenton's reading disregards the word "or" that separates the clauses and offers no legal or logical basis for departing from that term's ordinary, well settled, and disjunctive meaning. (See *In re Jesusa V.* (2004) 32 Cal.4th 588, 622.)

Kenton's remaining statutory interpretation arguments rely on tools of statutory construction that need not be considered because the plain meaning is clear. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1045; *Kavanaugh*, *supra*, 29 Cal.4th at p. 919.)

Because the court found Kenton took property by committing elder financial abuse within the meaning of section 15610.30, double damages were proper without a separate finding of bad faith.

### b. Constitutionality

Kenton complains Probate Code section 859 is unconstitutionally vague because the double damages penalty "may be arbitrarily imposed" depending on "whether one adopts the view that when a taking from an elder occurs through undue influence, it must be in bad faith, or whether by the trial

20

court's view that when financial elder abuse is the means of taking, there is no bad faith requirement." He also argues Probate Code section 859 violates equal protection because it punishes wrongdoers disparately according to family size. We reject both contentions.

"A party claiming that a legislative enactment is invalid on its face confronts daunting obstacles to success. The first hurdle to overcome is the bedrock principle that courts are exceedingly reluctant to declare legislation unconstitutional." (*Personal Watercraft Coalition v. Board of Supervisors* (2002) 100 Cal.App.4th 129, 137.) A statute "cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484.) As already indicated, it is reasonable and practical to construe Probate Code section 859 according to its plain meaning as allowing double damages when property is taken through commission of elder financial abuse pursuant to section 15610.30 without a finding of bad faith. That one of the three categories of conduct in Probate Code section 859 does not require a bad faith finding does not render the statute vague.

Kenton provides no authority to meaningfully support his equal protection argument. Accordingly, we disregard it. (See *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ("*Allen*") ["[w]hen legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration"].)

### c. Penalty Amount

Kenton's final argument is that the trial court erred in determining the penalty amount. Again, we disagree.

On June 20, 2017, a week before trial, Hilja's counsel emailed Kenton the following: "Per our conversation, my understanding is that you agree to

stipulate to the following valuations for purposes of damages at trial: [¶] 1. The value of the Trust's interest in 60, 50, and 21 Laurel Lane is $761,665. [¶] 2. The fair market rental value of the Trust's interest in 60, 50, and 21 Laurel Lane is $2,500 per month since your father's date of death. [¶] These valuations will remain the same irrespective if it is determined that the Trust has no interest in 21 Laurel Lane, or some non-fee simple interest in 21 Laurel Lane." The following day, Kenton responded, "Yes I think what you have written is acceptable." In its statement of decision, the trial court noted, "The parties have stipulated the Laurel Lane residence has a value of $761,665, and that its rental value is $2,500 per month." The court doubled the stipulated value of $761,665 to reach a statutory penalty of $1,523,330. The stipulation constituted substantial evidence to support the court's calculation.

Kenton argues the stipulated value was invalid because no stipulation was entered into the record and none was admitted into evidence at trial. Not so. The court's trial minutes indicate "counsel stipulate[d] to the admission of petitioner's exhibit #55 into evidence." Identified as Exhibit 55 in the record is the "6/21/2017" "Valuation Stipulation (email from Kenton Keading to [Hilja's counsel]." Likewise, the settled statement indicates the parties stipulated to the Property's value at $761,665. The settled statement notes the court overruled Kenton's objection to the stipulation, which meant the evidence was competent, admissible, and available to be used for determining damages.

Kenton next contends the stipulated value was invalid because it was not formally executed and the email represented "only . . . preliminary discussions relevant to laying the framework for such a stipulation, which never materialized." He proffers no authority or meaningful argument to

22

support this claim, so we do not consider it. (*Allen*, *supra*, 234 Cal.App.4th at p. 52.)

Kenton further claims the stipulated value was erroneous because: (1) it was based on present value of the Property rather than its value at the time of the taking; (2) Lewis supposedly held only a one-half interest in the Property, and the value of the Property taken was not capped accordingly; and (3) the stipulated value did not correspond to the value of the specific parcels taken. Kenton, however, provides no authority to support the first two contentions. (*Allen*, *supra*, 234 Cal.App.4th at p. 52.) As for the third contention, we observe the parties expressly agreed that (1) the stipulated value covered all parcels that comprised the Property and (2) the value would remain the same even if it were determined that trust excluded the parcel Kenton claims he did not take. In short, these contentions provide no basis for a reversal.

## B. Case No. A151468

We next consider Kenton's claims in connection with the prejudgment writ of attachment that the trial court issued in the elder abuse litigation.

" ' "Attachment is an ancillary or provisional remedy to aid in the collection of a money demand by seizure of property in advance of trial and judgment." ' [Citation.] California's Attachment Law (Code Civ. Proc., § 482.010 et seq.) is purely statutory and is strictly construed." (*Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1476, fn. omitted.) The purpose of a writ of attachment is to ensure recovery of payment in the event judgment is entered. "An attachment remedy would be useless if it required the court to first decide the merits and issue a judgment." (*Santa Clara Waste Water Co. v. Allied World National Assurance Co.* (2017) 18 Cal.App.5th 881, 889.) Section 15657.01 allows an

attachment to be issued in any action for damages for financial abuse of an elder. (§ 15657.01.)

In light of its purpose, a right to attach order may issue ex parte if the trial court finds, inter alia, that "the plaintiff will suffer great or irreparable injury . . . if issuance of the order is delayed until the matter can be heard on notice" and "the plaintiff has established the probable validity of the claim upon which the attachment is based." (Code Civ. Proc., § 485.220, subd. (a).) "A claim has 'probable validity' where it is more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." (*Id.*, § 481.190.)

To the extent an appellant's challenge to the trial court's probable validity determination "presents a question of fact, we apply the deferential substantial evidence standard of review" and will not "substitute [our] judgment for the trial court's express or implied findings supported by substantial evidence." (*Chino Commercial Bank, N.A. v. Peters* (2010) 190 Cal.App.4th 1163, 1169.) "To the extent, however, that the trial court's finding presents a question of law, we review it independently." (*Id.* at p. 1170.)

Upon finding that Hilja had a right to attach property belonging to Kenton in the amount of $1.73 million, the trial court here issued a writ of attachment for Kenton's interest in a property in Crockett.[4] In issuing the writ, the court explained it derived the amount of the attachment in part from Kenton's valuation of the Property at issue in the elder abuse litigation.

_____

[4] Kenton's notice designating the clerk's transcript omitted several documents filed and considered by the trial court in connection with the attachment order. Hilja requests we take judicial notice of a number of court-filed documents that bear on the order. We grant the unopposed requests, which provide a more complete record of the proceedings related to the attachment. (Evid. Code, § 452, subds. (c), (d).)

24

Kenton argues the trial court erred in issuing the attachment order ex parte because, among other reasons, there was no showing of irreparable harm or immediate danger. He also claims he had no legal or equitable interest in the Crockett property for which the writ was issued, and complains the court abused its discretion by refusing to consider his evidence of a quitclaim deed and associated promissory note demonstrating that he had transferred title to the Crockett property.

We decline to consider any of Kenton's arguments against the prejudgment attachment order because we conclude all such issues are now moot. " 'The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " (*In re Miranda* (2011) 191 Cal.App.4th 757, 762; see *Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174, 1178–1179.) The critical factor in considering mootness is "whether the appellate court can provide any effective relief if it finds reversible error" (*In re N.S.* (2016) 245 Cal.App.4th 53, 60), and we decide the question of mootness on a case-by-case basis (*In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1547).

Here, even if we were to find reversible error, we could not provide Kenton any meaningful relief. The remedy Kenton seeks is the vacatur of the attachment order or remand for a new hearing in which the trial court considers the evidence that Kenton claims was not previously considered. But none of these remedies would provide meaningful relief to Kenton under the circumstances. Weeks after Kenton noticed his appeal of the attachment order, the parties tried Hilja's elder abuse petition to the trial court. In its August 2017 statement of decision, the court found Kenton liable for elder

25

financial abuse, and in September 2017 it entered an amended judgment ordering Kenton to pay $1,548,830 in damages. Kenton does not dispute the amended judgment's recordation on the Crockett property. Because the challenged prejudgment attachment order has now been superseded by the amended judgment in the case, the appeal of that order is moot.

Kenton fails to address the implications of the amended judgment on his appeal or its recordation against the Crockett property. He identifies no effectual relief this court could now provide him if the attachment order were deemed erroneous. In short, he presents no compelling reason why this court should address his otherwise moot claims.

### C.    Case No. A152034

The remaining issues for us to consider arise from Kenton's separate libel proceeding against Hilja based on her email stating Kenton was homophobic and had committed elder abuse against their parents. Kenton argues the trial court erred by granting Hilja's motion to dismiss his complaint, denying him discovery to oppose the motion, and providing inadequate notice of the hearing on the motion. On all points, we disagree.

### 1. Dismissal under the Anti-SLAPP Statute

Code of Civil Procedure section 425.16 (hereafter, section 425.16), commonly known as the anti-SLAPP statute, provides a motion procedure for weeding out, early in a litigation, meritless claims challenging the exercise of constitutionally protected free speech rights. " 'Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a "summary-judgment-like

procedure." [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] "[C]laims with the requisite minimal merit may proceed." ' " [Citation.] 'We review de novo the grant or denial of an anti-SLAPP motion.' " (*Sweetwater Union High School Dist. v. Gilbane Building. Co.* (2019) 6 Cal.5th 931, 940.)

### a. Protected Activity

Kenton contends that Hilja did not meet her movant's burden of showing the alleged libel arose from protected activity.

"A defendant can meet the burden of making a threshold showing that a cause of action is one arising from protected activity by demonstrating the act underlying the plaintiff's cause of action falls within one of the four categories identified in section 425.16, subdivision (e)." (*Cabrera v. Alam* (2011) 197 Cal.App.4th 1077, 1086.) One category protects "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (Code Civ. Proc., § 425.16, subd. (e)(2).)

Courts take "a fairly expansive view of what constitutes litigation-related activities within the scope of section 425.16." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908.) As our Supreme Court has recognized, " '[j]ust as communications preparatory or in anticipation of bringing an action or other official proceeding are within the protection of the litigation privilege . . . , such statements are equally entitled to the benefits of section

27

425.16." (*Briggs v. Eden Council for Hope and Opportunity* (1999) 19 Cal.4th 1106, 1115.) Further, "[t]here is no requirement that the writing or speech be promulgated directly to the official body." (*Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 17, italics omitted.)

There is no dispute that Kenton's libel claim was based on the email Hilja sent to an attorney friend seeking a referral for a probate attorney to represent her in proceedings against her brother. Indeed, a few months after sending the email, Hilja had in fact retained counsel who filed a petition on her behalf against her brother for damages resulting from elder abuse. This was sufficient to show the email was a pre-litigation communication protected by section 425.16, subdivision (e).

### b. Probability of Prevailing

Kenton also claims the trial court erred when it determined he could not show a probability of success on the merits of his libel claim. In light of the judgment against Kenton on Hilja's elder abuse petition, we cannot agree with Kenton on this point. The gravamen of Kenton's libel case was Hilja's purportedly false accusation of elder abuse. Hilja prevailed on the merits of that claim, securing a judgment that found Kenton liable for elder financial abuse.[5] Accordingly, the court made no error when it concluded Kenton could not show a probability of prevailing on his claim.

Kenton additionally contends the trial court's judgment finding elder financial abuse did not concern all the purportedly false statements contained in Hilja's email. Specifically, he points to the portions of Hilja's email that accuses him of being "homophobic" and "dangerous" and engaging

---

[5]    We grant Hilja's request to judicially notice the court's statement of decision addressing her elder abuse claim against Kenton. (Evid. Code, § 452, subds. (c), (d).)

in "every literal category of elder abuse with his parents." None of these statements can rescue Kenton's complaint.

An essential element of libel is that the publication at issue contain a false statement of fact and not merely reflect an opinion. (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 600.) "The critical determination of whether the allegedly defamatory statement constitutes fact or opinion is a question of law." (*Id.* at p. 601.) Here, Hilja's statements to her attorney friend that her brother was "homophobic" and "dangerous" expressed no more than her subjective judgment about Kenton and were nonactionable opinions. (Cf. *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1149 [derogatory statements that defendant was dishonest and scary constituted nonactionable opinion].)

Moreover, Kenton had no probability of succeeding in proving libel based on Hilja's statement that he had committed "every literal category of elder abuse with his parents." To defend against libel, "it is not necessary to prove the literal truth of an allegedly libelous accusation in every detail, so long as the imputation is substantially true so as to justify the 'gist' or 'sting' of the remark." (*Emde v. San Joaquin County Central Labor Council* (1943) 23 Cal.2d 146, 160.) Because the court's judgment on Hilja's elder abuse petition effectively demonstrated that the gist of Hilja's statement accusing Kenton of elder abuse was substantially true, the statement was not actionable.

### 2. Denial of Limited Discovery Request

Kenton also contends the court erred when it denied him the opportunity for limited discovery.

The anti-SLAPP statute provides: "All discovery proceedings in the action shall be stayed upon the filing of a notice of motion made pursuant to

this section. The stay of discovery shall remain in effect until notice of entry of the order ruling on the motion." (Code Civ. Proc., § 425.16, subd. (g).) A trial court may lift the statutory stay for "good cause," which requires a showing that the specific discovery sought is both necessary "to establish a prima facie case" and "tailored to that end." (*Ibid.*; *Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882, 891.) We review a trial court's denial of a motion to lift a discovery stay for abuse of discretion. (*Ibid.*)

There is no way to determine whether the trial court erred or abused its discretion in denying Kenton's discovery request, because Kenton failed to provide an adequate record on the point. "It is well settled . . . that a party challenging a judgment has the burden of showing reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) Here, Kenton's election to proceed without a reporter's transcript leaves us unable to assess whether an abuse of discretion occurred. (See *Vo v. Las Virgenes Municipal Water Dist.* (2000) 79 Cal.App.4th 440, 447–448 ["absence of a record concerning what actually occurred at the trial precludes a determination that the trial court abused its discretion"].) In the absence of a complete record or one indicating otherwise, we presume the trial court performed its job correctly. (Evid. Code, § 664; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1461, fn. 5; *Olivia v. Suglio* (1956) 139 Cal.App.2d 7, 9 ["If the invalidity does not appear on the face of the record, it will be presumed that what ought to have been done was not only done but rightly done"].)

Kenton suggests our earlier order denying Hilja's motion to dismiss the appeal effectively signaled our rejection of the notion that the record was inadequate for appeal. Not so. The motion to dismiss was premised on alleged deficiencies in the record related to the trial court's decision on the anti-SLAPP motion which, as noted, we review de novo. Our order, however,

did not address Kenton's challenge to the court's discovery decision, which requires an abuse of discretion review. Without the transcript setting forth the reasons for the court's denial, there is no basis for finding an abuse of discretion.

Even if we consider the matter based on the limited materials in the clerk's transcript, we find no error. In determining whether good cause exists for lifting the discovery ban, the trial court should "consider the plaintiff's need for discovery in the context of the issues raised in the SLAPP motion. If, for example, the defendant contends the plaintiff cannot establish a probability of success on the merits because its complaint is legally deficient, no amount of discovery will cure that defect. In a libel case, unless it appears on the face of the complaint the plaintiff will be required to establish actual malice, or the defendant makes such a contention in its SLAPP motion, there is no need for the plaintiff to engage in discovery on that issue in order to show a reasonable probability of success on the merits. Even if it looks as if the defendant's actual malice may be an issue in the case, if it appears from the SLAPP motion there are significant issues as to falsity or publication—issues which the plaintiff should be able to establish without discovery—the court should consider resolving those issues before permitting what may otherwise turn out to be unnecessary, expensive and burdensome discovery proceedings." (*The Garment Workers Center v. Superior Court* (2004) 117 Cal.App.4th 1156, 1162, fn. omitted.)

Here, Kenton explained in his petition that he wanted to depose Hilja to demonstrate she "published the defamatory statement either knowing of its falsity or in reckless disregard of the truth." He added that such discovery was needed to establish malice. But in her motion to strike, Hilja principally argued that Kenton could not show a probability of prevailing on his claims

against her because the purportedly defamatory email was a privileged publication.  Because Hilja's privilege claim would be dispositive on the merits, it was well within the trial court's discretion to deny Kenton's request for discovery until the validity and applicability of the privilege were determined.

### 3.  *Notice of Anti-SLAPP Hearing*

Kenton argues the court failed to give him proper notice of the hearing on the anti-SLAPP motion to dismiss.  We disagree.

On April 10, 2017, the hearing on Hilja's anti-SLAPP motion was set for May 24, 2017.  The case docket in the record shows that proof of service of the motion was served and filed the next day.  Since the proof of service was not among the documents Kenton designated to include in the clerk's transcript, we presume it demonstrated proper service.  (*Oliveira v. Kiesler* (2012) 206 Cal.App.4th 1349, 1362.)

In the days leading up to the hearing on Hilja's anti-SLAPP motion, Kenton filed a series of ex parte and noticed motions to delay it.  On May 16, 2017, he filed a noticed motion to lift the stay on discovery and set it for hearing in July 2017.  Two days later, on May 18, 2017, he unsuccessfully moved ex parte to continue the May 24, 2017 anti-SLAPP hearing so his motion to lift the discovery stay could be heard beforehand.  On May 22, 2017, Kenton again moved ex parte for an order to continue the anti-SLAPP hearing to extend the briefing schedule for his opposition to Hilja's anti-SLAPP motion, or for an order allowing him to file his opposition late.  He also sought an order to shorten the time for his motion to lift the discovery stay.  The court continued these matters to May 24, 2017.

The trial court issued a tentative ruling for the May 24, 2017 proceedings.  In the tentative, which is transcribed in the register of action,

the court noted that "[a] review of the record shows that [Kenton] has twice attempted, after the time for response had expired, to obtain an ex parte order extending the time to respond. Neither was granted." The court noted it was inclined to allow the late filing of the opposition as long as Hilja had reasonable time to file an appropriate reply. In addition, it found no reason to open discovery and directed the parties "to be prepared to discuss the setting of a schedule for the reply filing and the hearing of the pending motion."

On May 24, 2017, Kenton appeared in propia persona at the hearing, and the tentative was argued. In its written order following the hearing, the trial court granted Hilja's anti-SLAPP motion, granted Kenton's request to shorten the time for his motion to lift the discovery stay, and then denied Kenton's motion on the merits.

On these facts, we reject Kenton's claim that he did not have proper notice regarding the anti-SLAPP hearing. The May 24, 2017 hearing had been noticed since early April 2017. Kenton was well aware of this, as both of his ex parte petitions leading up to that date referenced the May 24 hearing date. Neither of his requests for an extension prior to that date had been granted. Thus, because the hearing on the anti-SLAPP motion was never continued or taken off calendar, it was reasonable for the trial court to hear the matter when it did.

As Kenton observes, the trial court's tentative ruling directed the parties "to be prepared to discuss the setting of a schedule for the reply filing and the hearing of the pending motion." But Kenton asserts he reasonably believed this to mean that on May 24, 2017, "the parties would both need to appear to set a schedule for the defendant's reply filing and the hearing of the pending motion, NOT that the hearing of the pending motion would take

33

place on that date." When the court proceeded to hear the motion, he claims he was caught by surprise and prejudiced. Had he received proper notice, Kenton argues, there would have been a reasonable probability of a different outcome.

Even if the sequence of events led to some confusion, there is no reversible error here. Under our state Constitution, "a judgment [may] not be reversed unless error caused actual prejudice in light of the whole record." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 573; Cal. Const., art. VI, § 13.) The record here does not demonstrate that Kenton suffered actual prejudice. Indeed, the court granted his ex parte motion to shorten the time for his motion to lift the discovery stay and decided the motion on the merits. The court also accepted and considered Kenton's late brief in opposition to Hilja's anti-SLAPP motion and also considered the arguments he made at the hearing. Beyond his conclusory statement that he was prejudiced, he fails to show what other arguments he would have raised that would have resulted in a more favorable decision.

### 4. Hilja's Request for Sanctions

Hilja requests that this court on its own motion impose sanctions and attorney fees against Kenton because this appeal is meritless, frivolous, and filed in bad faith. Hilja, however, did not file a separate motion for sanctions or provide a declaration supporting the amount of monetary sanctions sought, as required under California Rules of Court, rule 8.276. Accordingly, to the extent Hilja's request constitutes a motion for sanctions, we deny it. (*Kajima Engineering and Construction, Inc. v. Pacific Bell* (2002) 103 Cal.App.4th 1397, 1402 [denying procedurally improper request for sanctions].) We also decline to impose sanctions on our own motion.

### 5. *Hilja's Request for Judicial Notice of Vexatious Litigant Order*

Finally, Hilja requests that we take judicial notice in this appeal of a May 2019 trial court order in Contra Costa County Superior Court Case No. MSP16-00402 (the elder abuse litigation) declaring Kenton a vexatious litigant. Hilja represents that the trial court below did not take judicial notice of the order because it was issued after the order and judgment giving rise to this appeal. Nonetheless, she contends the vexatious litigant order ought to apply in this appeal (Case No. A152034) because the order requires Kenton to "furnish security in the amount of $100,000" for each pending proceeding within 10 days of the order or "face dismissal without prejudice of each pending proceeding or action for which the security is not furnished." Hilja further represents that Kenton failed to conform with the bond requirement as to this appeal, which allows for its sua sponte dismissal.

We have received no opposition to Hilja's judicial notice request, but we nonetheless decline to grant it for the same reason it appears the trial court did. The appeal in this case was lodged by Kenton in August 2017 and has been fully briefed since May 2018, well before the vexatious litigant order issued. Accordingly, we have considered the appeal on the merits. In addition, we are aware that Kenton has appealed the vexatious litigant order in Case No. A157476, which is pending before this court.

### DISPOSITION

In Case No. A153075, the judgment is affirmed. In Case No. A151468, the appeal of the court's prejudgment writ of attachment order is dismissed as moot. In Case No. A152034, the order granting the motion to strike the complaint and dismissing the action is affirmed. Hilja Keading is awarded costs on all appeals.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Jackson, J.

A151468, A152034, A153075

36

*Keading v. Keading*  (A151468, A152034, A153075)

Trial Court: Contra Costa County

Trial Judge: John H. Sugiyama

Attorneys:

      Kenton Keading, pro per for Defendant and Appellant.

      Hartog, Baer & Hand, David W. Baer, Andrew R. Verriere, Jonna M. Thomas for Plaintiffs and Respondents.